UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |
|---|---|
| WANKE CASCADE DISTRIBUTION LTD., an Oregon corporation, | Case No.: 3:13-CV-768-AC |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER (ECF NO. 39) |
| FORBO FLOORING, INC., a Delaware corporation, | |
| Defendant. | |

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Wanke Cascade Distribution, Ltd. ("Wanke"), filed this lawsuit alleging Forbo

Flooring, Inc. ("Forbo"), breached their oral, long-term, exclusive distributor agreement by not

providing commercially reasonable notice of termination.  Wanke also asserts claims for breach of

Page 1 - FINDINGS AND RECOMMENDATION                                      *{SIB}*

the covenant of good faith and fair dealing based on the alleged lack of reasonable termination notice and intentional interference with economic relations based on Forbo's conduct after notice, and during a reasonable termination period.[1]  Forbo now moves for summary judgment on all three claims.

The court finds Wanke offered evidence raising a genuine issue of material fact on the reasonableness of Forbo's notice of termination, whether Forbo acted in good faith throughout the term of the contract, and the existence of improper means or an improper purpose relating to Forbo's acceptance of purchase orders prior to the termination of the oral agreement.  Accordingly, the court recommends Forbo's motion for summary judgment be denied in its entirety.

*Background*

I.  The Parties

Wanke, a company formed in the 1930's to sell plywood, became involved in the distribution of specialty flooring in 1959.  (McClory Decl. dated June 1, 2015, ECF No. 110 ("McClory June Decl.") Ex. 19.)  In 1969, Wanke expanded into the Seattle and Spokane, Washington, markets by purchasing Cascade Sale Company.  (McClory June Decl. Ex. 19.)  At present, Wanke has "approximately 100 employees providing distribution services in five western states with facilities totaling over 150,000 square feet."  (McClory June Decl. Ex. 18, at 1.)  Wanke handles flooring products from many of the industry's top brand names, including Formica, Columbia Clic, Domco, and Azrock.  (McClory June Decl. Ex. 19.)

Forbo is "the global market leader in commercial floor covering solutions.  Marmoleum, its

---

[1]The court dismissed Wanke's promissory estoppel and fraudulent misrepresentation claims on December 10, 2013.

flagship brand, owns the leadership position in the global linoleum market." (Asai Decl. dated June 29, 2015, ECF No. 119, Ex. 7, at 45.)  From 2009 to 2011, Forbo had more than seventy-seven percent of the linoleum market share in the United States, averaging about seventy-eight and a half percent.  (McClory June Decl. Ex. 70.)

II.  Wanke's Relationship with Forbo

In the early 1990's, Wanke entered into a distributor relationship with Forbo.  (Radditz Dep. 31:13-20.)  Forbo prepared a "memo of agreement" with an effective date of January 1, 1993, setting forth the terms of its distributor agreement with Wanke (the "Memo").  (McClory June Decl. Ex. 65.)  The Memo specifically provided "either party may cancel this agreement for cause or not with sixty (60) days written notice to the other."  (McClory June Decl. Ex. 65.)  Brian Radditz, President of Wanke from 1997 to 2007 ("Radditz"), refused to sign the Memo because Forbo was unwilling to negotiate the terms contained therein.  (Radditz Dep. 4:7-9, 4:17-19, 9:21-10:2, 31:21-32:25, 34:2-7; Darragh Dep. 151:9-14.)  The resulting oral agreement between the parties was based on trust and merely required Forbo to provide the best product it could and Wanke to sell as much of that product as it could.  (Radditz Dep. 34:8-15.)  Forbo eventually became Wanke's core[2] line, representing more then twenty-five percent of its sales at different times.  (Heagy Dep. dated June 4, 2014 ("Heagy June Dep."), 23:19-24:9.)

In a November 7, 2000 letter, Casey Johnson, National Sales Manager for Wanke until January 1, 2012, when he became Wanke's Western Regional Manager ("Johnson"), advised Wanke

---

[2]Brian Heagy ("Heagy"), Director of Financing and Administration for Buckwold, based his characterization of "core" on identity in the marketplace, the primary brand carried by a distributor as recognized in the trade, the importance such relationship gives you in the trade, and sales volume. (Heagy June Dep. 4:19-21, 5:7-12, 96:7-15.)

of Forbo's decision to "exercise our 60-day notification clause in our distributor agreement for the Utah and Southern Idaho market currently serviced by Wanke Cascade effective January 15, 2000."[3] (McClory June Decl. Ex. 64.)  The "distributor agreement" referenced by Johnson was the Memo, which Forbo then believed had been signed by the parties.  (Johnson Dep. 156:25-157:15; Darragh Dep. 166:14-18.)  Forbo based its decision to terminate Wanke on Wanke's scaled-back efforts in this market and resulting lack of growth.  (McClory June Decl. Ex. 64; Johnson Dep. 155:14-156:11.)  For nearly eighteen months preceding the November 7, 2000 letter, the parties had engaged in lengthy, but unsuccessful, discussions regarding Forbo's concerns and ways in which Wanke could improve the situation.  (Bruce Buckwold Dep. ("Bruce Dep.") 10:20-11:23; Radditz Dep. 37:6-20.)  In the end, Forbo agreed to pay Wanke a five percent specification fee for a period of ninety days after the termination date.  (McClory June Decl. Ex. 64.)

    In early 2005, the Wanke shareholders asked Radditz to sell Wanke after it became evident the next generation was not interested in running the business.  (Radditz Dep. 11:14-25.)  Radditz identified Buckwold Western Limited ("Buckwold") as a potential buyer.  Buckwold is a flooring distributor with a primary presence in Canada.  Buckwold has been a dealer of Armstrong World Industries ("Armstrong") flooring since 1995, is Armstrong's exclusive distributor in Western Canada since 1998, and is a mid-size distributor of Armstrong flooring in North America.  (Richard Buckwold Dep. ("Richard Dep.") 16:4-18; Born Dep. 14:6-16.)   Buckwold is a significant competitor of Forbo in Western Canada.  (Richard Dep. 16:22-17:4.)

    During the negotiation phase, Radditz informed Dennis Darragh, Forbo's General Manager for North America  ("Darragh"), Buckwold was considering purchasing Wanke.  (Asai Decl. Ex. 6,

---

[3]It appears the termination was to be effective January 15, 2001, not 2000.

at 27; Radditz Dep. 40:2-9.)  Radditz asked Darragh if Forbo would be interested in continuing its relationship with Wanke in the event Buckwold went through with the purchase.  (Radditz Dep. 41:4-24.)  Darragh did not express any objection to the sale or to continuing Forbo's distributor relationship with Wanke after the sale.  (Radditz Dep. 42:1-4.)  Radditz shared this information with Buckwold.

No one from Buckwold contacted Forbo before the sale.  (Bruce Dep. 43:21-44:3.)  Rather, Buckwold relied on Radditz's conversations with Forbo and Forbo's assurance that once Buckwold confirmed its commitment to continue the existing distributor relationship between Wanke and Forbo, Forbo had no problem continuing the relationship with Wanke.  (Bruce Dep. 44:15-45:4.) At that time, Bruce Buckwold, President of Buckwold since the early 1990's and eventual co-owner of Wanke ("Bruce"), was satisfied with the existing long-term oral commitment between Wanke and Forbo.  (Bruce Dep. 4:20-22, 5:6-14, 42:1-2, 9-10; Mark Buckwold Dep. dated June 11, 2014 ("Mark June Dep."), 50:17-21.)  Mark Buckwold, who joined Wanke in 2006 and has been President of Wanke since the end of 2011 ("Mark"), understood Forbo and Wanke had an oral agreement that Wanke would continue to market and distribute Forbo products in the Pacific Northwest as Wanke's sole linoleum product.  (Mark June Dep. 4:23-25, 5:9-16, 9:21-10:22, 181:21-24.)

In 2006, after Buckwold's purchase of Wanke was completed, Bruce met with Darragh to confirm the continuation of the oral distributor agreement between the parties.  (Bruce Dep. 44:15-45:4, 111:11-19.) Darragh expressed concern Wanke would drop Forbo in favor of Armstrong based on Buckwold's strong relationship with Armstrong in Canada, but indicated if Buckwold would commit to continue Wanke's existing distributor relationship with Forbo as its core product line and not sell Armstrong flooring, Forbo would allow Wanke to remain the exclusive distributor of Forbo

in the Pacific Northwest.  (Bruce Dep. 111:20-112:11.)  Bruce advised Darragh that Buckwold purchased Wanke to be a Forbo distributor and had no intentions of Wanke becoming a distributor for Armstrong.  (Bruce Dep. 112:1-3.)  Based on Darragh's commitment to Bruce that Wanke would be a "long-term" distributor of Forbo, Wanke invested significantly in terms of personnel, salesman, sales support, samples, designers, warehouse acquisition and upgrades, and generally developing the Forbo flooring line to the extent Wanke became synonymous with Forbo in the Pacific Northwest marketplace. (Heagy June Dep. 23:19-24:9, 125:2-126:12.)

To Bruce, the long-term oral agreement meant the parties were working together toward the core goal of establishing Forbo's product in the marketplace.  (Bruce Dep. 42:11-17.)  He and other Wanke personnel believed the relationship between Wanke and Forbo would last twenty years. (Bruce Dep. 380:8-13.)  While he understood Forbo had the right to terminate the relationship with Wanke, Bruce thought Forbo would act fairly and reasonably in doing so.  (Bruce Dep. 109:7-15.) However, the parties never discussed how they would terminate the oral agreement.  (Bruce Dep. 120:17-121:19.)

In October 2010, Armstrong initiated exploratory conversations with Buckwold to discuss the possibility of Wanke becoming an Armstrong distributor.  (McClory June Decl. Ex. 57, at 6; Born Dep. 35:1-23.)  Armstrong expressed interest in making Wanke its exclusive residential distributor in the Pacific Northwest, but required Wanke to stop distributing flooring for its competitors, including Forbo.  (Born Dep. 50:3-8, 52:5-19; Richard Dep. 84:14-85:18, 90:13-91:4.)  Wanke was not willing to do so, in large part because of the good relationship it had with Forbo, which Wanke confirmed with Forbo during the course of the negotiations.  (Richard Dep. 85:1-11; Heagy June Dep. 142:9-23.) During these conversations, no one from Buckwold or Wanke informed

Armstrong that Wanke needed to provide Forbo with one year's notice before terminating their distributor relationship. (Born Dep. 62:17-21; Heagy June Dep. 143:5-9.)

From 2008 to 2012, while acting as the exclusive distributor for Forbo in the Pacific Northwest, Wanke lost money. (Heagy June Dep. 69:5-70:6) In a December 2011 email, Terry Goodall, Wanke's Commercial Sales Manager ("Goodall"), advised Mark, Dale Reimer, Wanke's Operations Manager since June 2008 ("Reimer"), Raymond Eppley, Vice President of Sales and Marketing for Wanke through mid-2012 ("Eppley"), and Shawn Loomis, Wanke's Regional Sales Manager ("Loomis"), that Forbo was unhappy with Wanke's recent purchase history of Forbo flooring, a resulting depletion of inventory, and the hiring of A&D reps. (McClory June Decl. Ex. 35; Goodall Dep. 6:3-12; Reimer Dep. 183:22-24; Eppley Dep. 6:4-7, 6:20-25, 123:8-14; Loomis Dep. 4:7-9, 4:15-19.) Wanke's purchases of Forbo flooring were more than twenty-five percent below budget that year. (McClory June Decl. Ex. 37, at 4.)

In February 2012, Wanke advised Forbo of its plans to upgrade its offices in Portland, Oregon, and Seattle, Washington, and asked Forbo for a discount on materials. (Asai Decl. Ex. 5, at 95.) Johnson forwarded Wanke's request to Darragh. (Asai Decl. Ex. 5, at 81; McClory June Decl. Ex. 37 at 3; Johnson Dep. 8:20-9:2.) In response, Darragh informed Johnson that Forbo would likely soon be terminating its distributor relationship with Phoenix Floor & Wall Products Inc. of Ontario, Canada ("Phoenix"). (Asai Decl. Ex. 5, at 80.) Darragh believed that once Wanke knew of the Phoenix termination, Wanke would begin to try to migrate to Armstrong forcing Forbo to terminate its distributor relationship with Wanke shortly thereafter. (Asai Decl. Ex. 5, at 80.)

In reply, Johnson stated:

I was aware of your thought process of letting Wanke go or them resigning once we

make the move in Canada.  I am just trying to support them by keep up appearances of support.  What are they going to do remodel twice?  It looks like they are starting the remodel and I wanted to put something in front of them.  I will propose as a 75/25 and get them to place their order.

Regarding the move to direct in Wanke's area I would request that my percentage for the Wanke area (UT ID if needed) move down to .75% or .67% to help offset the cost of this move.

(Asai Decl. Ex. 5, at 80.)  Johnson's comment about remodeling twice referred to the unlikelihood that once Wanke installed Forbo flooring, it would be unlikely to remove it if Forbo terminated their relationship the end of 2012, leaving the Forbo flooring as an advertising tool and justifying the discount.  (Johnson Dep. 179:23-180:4.)  In a February 20, 2012 email, Johnson offered to provide some "reduction strategies if we move away from Wanke."  (Asai Decl. Ex. 5, at 85.)

In a letter dated March 30, 2012, Forbo advised Phoenix of its decision to terminate the parties' distributor agreement.  (Asai Decl. Ex. 24, at 1.) Pursuant to the terms of the agreement, either party had the right to terminate after expiration of the initial three-year term with one-hundred-and-eighty days' written notice.  (Asai Decl. Ex. 24, at 1.)  The initial term expired September 16, 2012, making the termination effective March 16, 2013.  (Asai Decl. Ex. 24, at 1.)  Forbo reminded Phoenix of its good faith obligation to carry on business in the ordinary course pending the termination and ensure all existing relationships with suppliers and customers remained intact.  (Asai Decl. Ex. 24 at 1.)  Forbo noted in the termination letter that:

Forbo is not obligated to notify you now of its decision to terminate effective March 16, 2013.  Legally speaking, Forbo would have waited until after expiration of the initial Term to do so. Nevertheless, we have decided to notify you now as a gesture of good faith – to give you almost double the legally required 180 days' notice of termination.  We are doing so to give you as much opportunity as possible to develop a plan for realigning your operations in light of the pending termination.

To assist you in the development of your realignment plan, we are also giving

you advance notice of our willingness to purchase certain assets, and assume liabilities, relating to your existing operations.  We wish to point out that:

1.  Forbo's willingness to negotiate the proposed transaction does not constitute a legal enforceable commitment to purchase any Phoenix assets or assume any Phoenix liabilities;

2.  such a commitment would only arise upon negotiation and completion of a written Agreement of Purchase & Sale on terms mutually satisfactory to the parties; and

3.  the proposed transaction must close no later than May 31st of this year.  This means that any negotiations to this effect must begin as soon as possible.  Therefore, I urge you to contact me if and when you determine that Phoenix is prepared to embark on such discussions.

(Asai Decl. Ex. 24, at 1.)  The extended notice period provided by Forbo to Phoenix the was result

of the  dual-exlusive nature of the relationship – Phoenix sold only Forbo flooring and Forbo sold

flooring only through Phoenix in the relevant territory – and the reality that termination of the

distributor agreement would require Phoenix to either close or find other flooring products to sell.

(Darragh Dep. 265:18-5.)  The Phoenix termination was described as "a continuation of [Forbo's]

North American marketing strategy to enhance sales volumes and margins by removing distributors

from the supply chain."  (Asai Confidential Decl. dated June 29, 2015,  ECF No. 121 ("Asai Conf.

Decl."), Ex. 26-A, at 30.)

Bruce considered Forbo's purchase of Phoenix and assumption of its distribution facilities

evidence of a lack of confidence by Forbo in outside distributors.  (Bruce Dep. 498:21-499:10.)

Forbo had terminated approximately fourteen distributor agreements in North America from 1987

to 2012 in the hopes of increasing sales volume by employing a more focused Forbo sales force.

(McClory Decl. dated July 17, 2015, ECF No. 124 ("McClory July Decl."), Ex. 84, at 6.)  Forbo's

philosophy is, in light of their unique flooring, selling directly though a sales force with a specific

expertise is the only way Forbo can become successful.  (Darragh Dep. 69:3-22.)    At this time,

Wanke was aware it was the last major distributor Forbo had in North America. (Heagy June Dep. 265:1-8.)

As of April 2012, Wanke's purchase of Forbo flooring was twenty-seven percent below budget. (McClory June Decl. Ex. 37, at 4.) Wanke sold $7,128,631 of Forbo flooring from May 2011 to April 2012, which was nearly $1,100,000 less than the $8,203,715 sold during the same period the preceding year. (McClory June Decl. Ex. 38.) Eppley expressed concern with these numbers in a May 2012 memorandum to Wanke senior management and encouraged increased communications with Forbo dealers to push Forbo flooring. (McClory June Decl. Ex. 38; Eppley Dep. 123:9-124:9)

In a May, 2012 email, Johnson asked Jamie Thorn, Forbo's National Sales Manager ("Thorn") if Forbo wanted to increase the VIP pricing offered to Wanke by three percent over the October 2011 pricing. (Asai Decl. Ex. 6, at 27, 28.) Thorn forwarded the question to Darragh asking whether the three percent was enough and "do we want to even pursue this since our future plans will not include them?" (Asai Decl. Ex. 6, at 27.) Darragh responded "3% is fine. I want things to appear normal so we need to support this." (Asai Decl. Ex. 6 at 27.)

Darragh was against terminating Wanke at the time due to the complexities of assuming distribution responsibilities in Canada. (Darragh Dep. 292:16-293:2.) To that end, Darragh's budget proposal, offered in September, was based on a continued relationship with Wanke. (Darragh Dep. 292:16-293:2.) However, Forbo was experiencing is its worst year financially since 2007 and Darragh was under substantial pressure to improve short-term profitability and, in turn, terminate Wanke. (Darragh Dep. 293:13-25.) Darragh continued to try to delay the inevitable termination of Wanke but, in October, gave in and began to plan and prepare for such eventuality. (Darragh Dep.

295:3-297:4.)  In an October 2012 email to Thorn, Darragh referenced a discussion about plans to terminate Wanke before Thanksgiving.  (Asai Decl. Ex. 7 at 38; Darragh Dep. 292:1-4.)

Mark met with Johnson the end of October 2012 to discuss Forbo's acquisition of Phoenix, the discontinuation of the FIST[4] program, and other general business matters related to Wanke. (Mark June Dep. 14:21-25; Bruce Dep. 496:14-17.)  After each termination of a full-line exclusive distributor, such as Phoenix, Forbo would call its other full-line exclusive distributors, such as Wanke, to inform them of the termination and assure them the action was based on the particular market and did not mean all such distributors were on the chopping block.  (Johnson Dep. 95:22-97:2, 98:6-14, 101:10-17.)  Despite the continued drop in sales numbers, Johnson was very encouraging, telling Wanke to have a positive attitude and that all of Wanke's hard work would pay off shortly. (Asai Conf. Decl. Ex. 11-A, at 1; Goodall Dep. 183:11-184:10.)  Johnson assured Mark there was no definitive plan in place to terminate Forbo's distribution agreement with Wanke and that Forbo intended to continue its relationship with Wanke into 2013.  (Johnson Dep. 99:16-100:6, 135:17-21.)  In fact, Johnson had been directed to develop his 2013 budget assuming Wanke was continuing as a distributor.  (Johnson Dep. 100:22-101-17.)  However, Johnson was concerned Forbo's termination of the FIST program might foreshadow Wanke's termination.  (Johnson Dep. 135:17-136:1.)

Mark and Reimer met with Johnson in early December 2012 to discuss budgets and the amount of flooring Wanke would purchase from Forbo in 2013.  (Mark June Dep. 13:4-22.) Despite the decrease in Forbo flooring purchases, Johnson again assured Mark that Forbo remained satisfied

---

[4]The FIST program was a purchasing program offered by Forbo to its distributors.  (Reimer Dep. 152:19-25.)

with with Wanke as its distributor and that everything was fine between Wanke and Forbo.  (Reimer Dep. 151:16-25; 152:8-15.)

In a December 10, 2012 email, Thorn told Johnson "We need to go ahead and move asap on Wanke" and asked how many people needed to be hired and a reasonable termination date.  (Asai Decl. Ex. 5, at 89.)  Johnson responded he would need four people, had already interviewed two people for the Seattle position, and would like to consider some of Wanke's reps for the Central Washington/Montana position but would not be able to do so until Wanke was informed of the termination.  (Asai Decl. Ex. 5, at 89.)  Johnson suggested Forbo notify of Wanke of the impending termination  on February 1, 2013, if possible.  (Asai Decl. Ex. 5, at 89.)

The next day, Thorn advised Johnson that Forbo needed "to have Wanke gone before the start of the 2nd Quarter."  (Asai Decl. Ex. 5, at 91.)  Thorn referenced a sixty-day termination clause and indicated notification of termination should happen between January 28 and January 30, 2013.  (Asai Decl. Ex. 5, at 92.)  Johnson asked Thorn and Darragh for a date they could all meet with Wanke, noting he thought a visit was in order based on the nearly twenty-year relationship between Forbo and Wanke, and Wanke's help in establishing the "best population based penetration even at distributor dollars."  (Asai Decl. Ex. 5, at 91.)

In a January 7, 2013 email from Johnson to Cheryl McNabb, an account executive for Forbo and the individual identified by Johnson to assume responsibility for the Oregon and Northern Washington territory upon Wanke's termination ("McNabb"), Mark, and Goodall, Johnson expressed concern over Wanke's 2012 sales numbers but encouraged Wanke to look to a more successful 2013.  (Asai Decl. Ex. 5, at 88, Ex. 25, at 1; Asai Conf. Decl. Ex. 5-A, at 1.)  The email read:

Please find attached Year-end numbers for 2013.[5]  I know the numbers are not what any of us wanted or expected but we need to understand them and move on to a more successful 2013.  With this in mind you will see a more than fair 2013 Budget built on a very forgiving first part of the year with built expectation for a very strong finish to the year.  As Jamie stated at the NASM this is not a number we can miss.  As you can all see in the Wanke track sheet Wanke did a fairly good job of reducing inventories levels [as] the purchase deficit this year was over $800 k.  Over the new few days I will be scheduling a meeting with all of your to go over our plan[n]ed strategy for a successful 2013 and beyond.

(Asai Conf. Decl. Ex. 5-A, at 1.)

In a January 8, 2013 meeting, Johnson told Mark there was a "high probability" Forbo would terminate its distributor relationship with Wanke in the near future to allow Forbo to sell directly to dealers in the Pacific Northwest.  (McClory June Decl. Ex. 40; Mark June Dep. 178:1-8.)  Darragh had advised Johnson the previous week that approval of Wanke's termination was pending but Johnson, with Darragh's consent, wanted to give Wanke a "heads up" so the termination would not be a complete surprise.  (McClory June Decl. Ex. 40; Johnson Dep. 139:3-140:4, 200:8-17.)  Darragh did not believe Wanke had any idea Forbo intended to terminate it at this time.  (Darragh Dep. 347:13-18.)

Johnson and Mark did not discuss the logistics or time frame for the expected termination at the January 8 meeting.  (McClory June Decl. Ex. 40.)  Mark anticipated Wanke would have at least a year's transition period, based on the long-term relationship with Forbo and the amount of work needed for a successful transition. (Mark June Dep. 210:3-211:4.) That evening, Mark advised Bruce, Richard Buckwold, Operations Manager of Buckwold since 1978 and co-owner of Wanke ("Richard"), and Heagy of the likely termination, which he attributed to a big shake-up in Forbo's upper management, the successful transition of business from Phoenix to Forbo, and the

_____

[5]It appears Johnson meant to refer to year-end numbers for 2012.

investigation of options to improve Forbo's profitability.  (Richard Dep. 6:20-7:7, 11:20-25;  Mark June Decl. 50:17-21; McClory June Decl. Ex. 40.)  Mark noted that while the termination was not one-hundred percent certain, "we always knew that this was a distinct possibility with Forbo" and that Wanke should prepare for a change.  (McClory June Decl. Ex. 40; Mark June Dep. 195:9-21.)

Mark did not contact Forbo to discuss what Wanke might do to ensure the relationship would continue because Mark was unsure the termination was, in fact, imminent.  (Mark June Dep. 194:2-12, 194:20-24.)  However, Bruce contacted Darragh in late January to discuss the possible termination.  (Mark June Dep. 196:3-18.)  During this conversation, Darragh advised Bruce that the successful transition to in-house distribution in Canada caused the new Forbo board of directors to consider terminating Forbo's relationship with Wanke and take the Pacific Northwest territory in-house as well in the hopes of increasing Forbo's profitability.  (Bruce Dep. 414:9-25.)  Darragh mentioned the sixty-day notice provision in the Memo and when Bruce represented he did not have a written contract with Forbo, Darragh suggested Bruce look for the Memo.  (Bruce Dep. 415:1-9.)  Bruce indicated he was concerned about making the final FIST payment to Forbo in light of the confusion with regard to the parties' relationship going forward.  (Bruce Dep. 415:10-18.)  Darragh understood Bruce's concern and assured Bruce he should do what he felt necessary protect his position.  (Bruce Dep. 415:19-24.)  Bruce expressed his frustration and anger over Forbo's decision to terminate what Bruce considered a long-term commitment and Wanke's resulting rejection of opportunities to sell Armstrong flooring based on its commitment to Forbo. (Bruce Dep. 415:25-10.)

In an email dated January 30, 2013, Johnson forwarded Mark a copy of the termination letter Mark would receive in the mail the following day.  (McClory June Decl. Ex. 41, at 1.)  The termination letter, signed by Darragh, stated:

This letter serves as written notice that Forbo Flooring, Inc., will cancel its distributor agreement with Wanke Cascade Distribution LTD effective April 1, 2013.  While Bruce has stated that no contract exists between Forbo and Wanke (thereby giving Forbo the immediate right to terminate the parties' at-will relationship), Forbo is nevertheless providing Wanke with 60 days advance notice pursuant to the parties' 1993 Memo of Agreement.

Casey Johnson and I would like to schedule a meeting with you to work out the details of the termination.  Casey will contact you to arrange the date and place.

During the next two months Forbo expects Wanke to continue paying amounts owning to Forbo as they come due.  I had allowed Bruce the provision to hold payments until the decision was made, and the termination process started.  Provided that Wanke pays its bills in a timely manner, Forbo will continue to ship materials Wanke has or will order.

Transitions are never easy.  I will assure you that all Forbo personnel will maintain professional standards through this transaction.  We will work with you to bring this situation to a fair close.

(McClory June Decl. Ex. 41, at 2.)  Bruce asked Darragh to provide a copy of the Memo, and Forbo immediately produced an unsigned copy of the Memo.  (Bruce Dep. 415:6-9,417:19-418:1; Darragh 411:23-25.)

Forbo's decision to terminate its distributor relationship with Wanke was based on Forbo's business requirements and need for short-term profitability.  (Darragh Dep. 317:14-22, 320:8-18.) While Wanke's performance did not merit Forbo continuing the relationship and was a factor in Forbo's decision , it was not the sole, or primary, reason for the termination.  (Darragh Dep. 317:23-319:5.)

In every previous termination of a full-line exclusive distributor by Forbo to allow it sell directly into the market, Forbo issued a joint press release with the terminated distributor.  (Johnson 54:6-55:12.)   Consequently, in an email dated February 4, 2013, Forbo forwarded to Wanke a proposed press release announcing the end of Forbo's distributor relationship with Wanke.

Page 15 - FINDINGS AND RECOMMENDATION                                {SIB}

(McClory July Decl. Ex. 79.)  Forbo advised Wanke it intended to distribute the press release on

February 14, 2013, and asked Wanke to provide any comments they wished to make before February

11, 2013.  (McClory July Decl. Ex. 79.)  The proposed press release stated:

> Dear Customer:
>
> In a rapidly changing business environment, sometimes change takes two companies
> with a successful long term relationship in different directions.  Such is the case with
> Wanke Cascade and Forbo Flooring Systems.  Effective April 1, 2013, Wanke
> Cascade will no longer purchase or distribute Forbo Flooring Systems products and
> Forbo will be selling products directly to the flooring dealers.
>
> It is both companies desire that this transition occur with a minimal disruption as
> possible to our mutual customer base, and we will work closely to ensure a smooth
> transaction.

(McClory July Decl. Ex. 79, at 2.)

In response to an email inquiry from Johnson about the status of the Wanke termination on

February 11, 2013, Darragh stated "Lawsuit, Stanley Stephens clone letter, Fucking entitled assholes.

I'm gonna bury them."  (Asai Decl. Ex. 7, at 43.)  Johnson then asked about how to proceed with a

request from Wanke regarding rebates and a spiff program, and informed Darragh it did not appear

Wanke's commercial sales manager or sales representatives were aware of the termination.  (Asai

Decl. Ex. 7, at 42.)

The next day, in a confidential email to two of Forbo's sales managers in Canada, Darragh

explained Forbo was terminating Wanke as its distributor in the Pacific Northwest and intended to

publicly announce the termination by the end of the week.  (Asai Decl. Ex. 7, at 44.)  Darragh

indicated Wanke was owned by the Buckwolds, that Bruce was not taking the termination well and

intended to pursue legal recourse, and implied the Buckwolds may try to sabotage Forbo in Western

Canada.  (Asai Decl. Ex. 7, at 44.)    Darragh suggested the managers inform their staff of his

concerns once the formal announcement was made and keep an ear to the ground on pricing, specs, and projects, and ended with "If you have a strategy where we could really hurt them, I am all ears. They are vulnerable." (Asai Decl. Ex. 7, at 44.)

On February 12, 2013, Wanke objected to the statement in the press release that Wanke would not be able to purchase or distribute Forbo flooring after April 1, 2013, noting it had existing contracts with contractors and others requiring future purchases and distribution. (McClory July Decl. Ex. 87.) Wanke also was concerned the announcement would interfere in Wanke's relationship with its customers. (McClory July Decl. Ex. 87; Bruce Dep. 324:4-14.)

Additionally, Wanke objected to the issuance of any press release at that time based on Wanke's dispute of Forbo's right to terminate the distributor agreement on just sixty days' notice. (McClory July Decl. Ex. 87.) Bruce did not feel Forbo had the right to unilaterally select a sixty-day termination notice period in light of Wanke's substantial investment of money and effort in establishing the Forbo name in the Pacific Northwest, including investments in a dealer network, sales force, technology, warehouses, and displays. (Bruce Dep. 287:18-286:15.) Bruce believed Darragh knew Wanke expected a one-year notice of termination, which Bruce characterized as fair and reasonable. (Bruce Dep. 309:15-23.)

Later that day, Forbo provided Wanke with a redrafted press release addressing Wanke's concerns and asked Wanke to make any additional comments by 5:00 p.m. EST on February 13, 2013. (McClory July Decl. Ex. 87.) The revised press release read:

Forbo Flooring Systems takes a direct approach to the Pacific Northwest market

Hazetlon, PA, February 14, 2013 – In a rapidly changing business environment, companies sometimes must re-evaluate how they approach the market, as is the case for Forbo Flooring Systems. By April 1, 2013, Forbo will sell products directly to

flooring dealers in the Pacific Northwest.

Forbo looks forward to building a relationship with its new direct customer base.  In preparation, flooring dealers in the Pacific Northwest should please contact Forbo's Credit department at 570-450-0209, or visit www.forboflooringNA.com/welcome to download the Forbo Welcome Packet, which contains information and a credit application that will simplify doing business with Forbo Flooring Systems.

Forbo Flooring Systems is the global market leader in commercial floor covering solutions.  Marmoleum, its flagship brand, owns the leadership position in the global linoleum market, while Flotex dominates the rapidly growing flocked flooring market.  In addition to linoleum-based products, Forbo develops, manufactures and markets a diversity of high quality vinyl and textile floor covering and Coral & Nuway entrance systems solutions.  Forbo also offers a full range of professional service products.  All Forbo products combine high levels of functionality and durability.  Forbo Flooring Systems is committed to environmentally responsible production, sustainable practices throughout its global operations, and to far-reaching customer service.    Please  visit  our  website  for  more  information: www.forboflooringNA.com.

(Asai Decl. Ex. 7, at 45.) The press release was issued on February 14, 2013, apparently without

further objections from Wanke.  (Asai Decl. Ex. 7, at 45.)

Bruce thought the press release created confusion with regard to Wanke's continued

viability based on the loss of one of Wanke's major lines, caused Wanke customers to defer placing

orders for Forbo flooring until after April 1, 2013,[6] and resulted in the loss of display placements.

(Bruce Dep. 320:18-322-16.)    He considered the press release to be a violation of Forbo's duties

to Wanke to support Wanke as the exclusive distributor of Forbo flooring through April 1, 2013.

(Bruce Dep. 324:16-325:3.)  Heagy similarly thought the announcement, which was issued before

Wanke advised its employees of the termination, damaged Wanke's reputation and inhibited

Wanke's position of strength when approaching other dealers.  (Heagy Dep. dated Oct. 21, 2014

---

[6]Despite the issuance of the press release, a number of Wanke customers remained unaware Forbo was terminating its relationship with Wanke and would begin selling Forbo flooring directly after April 1, 2013.  (Goodall Dep. 278:23-280:13.)

("Heagy Oct. Dep."), 81:24-82:11.)

In response to the issuance of the press release, Wanke advised its customer service staff in a February 15, 2013, memo, to inform dealers Wanke would continue to place orders with Forbo for product not currently in Wanke's inventory through April 1, 2013.  (McClory June Decl. Ex. 42, at 2.)  Furthermore, the memo emphasized Wanke was committed to keeping its communications with its dealers positive and that no one should "bad mouth" Forbo.  (McClory June Decl. Ex. 41, at 1.)

About this time, Bruce contacted Dominic Rice, Vice President and General Manager of commercial flooring for Armstrong ("Rice"), to again discuss the possibility of Wanke becoming an Armstrong distributor in the Pacific Northwest.  (McClory June Decl. Ex. 55; Bruce Dep. 430:23-431:20.)  While Forbo held the clear majority of the linoleum market share in the United States, Armstrong averaged about sixteen percent of the market and Tarkett averaged about four and a half percent.  (McClory June Decl. Ex. 70.)  Rice advised Bruce that Armstrong was not actively looking to make a distribution change in that territory, but indicated he would discuss it internally and let Bruce know for sure if Armstrong was interested in pursuing a change.  (McClory June Decl. Ex. 55.)  Within a week or two, Armstrong advised Bruce it, in fact, was not considering making a change at that time.  (Bruce Dep. 432:1-8.)  Bruce also contacted Tarkett, who responded similarly. (Bruce Dep. 433:10-19.)

In late February 2013, Wanke considered identifying Forbo displays currently on the floors of dealers that could be removed and replaced with displays from other flooring manufacturers to take advantage of the confusion created by the Forbo press release.  (McClory June Decl. Ex. 43; Mark June Dep. 227:4-19, 228:17-229:10.)  Wanke was specifically interested in replacing Forbo displays with IVC displays and contacted IVC on February 20, 2013, to see if they would be wiling

to discount IVC displays to that end.  (McClory June Decl. Ex. 43; Mark June Dep. 230:20-25, 231:11-232:11.)  When IVC replied in the affirmative, Wanke began reviewing the list of retailers with Forbo displays to identify which retailers did not already have IVC displays and should be targeted.  (McClory June Decl. Ex. 44, at 2; Mark June Dep. 234:1-10, 235:1-14.)

Once the press release was issued, McNabb began receiving telephone calls from dealers in the Pacific Northwest seeking information on the distribution change.  (McNabb Dep. 110:6-9.)  In late February 2013, McNabb contacted Forbo's flagship dealers in the Pacific Northwest to make arrangements to meet in person and discuss the change.  (McNabb Dep. 110:1-6.)  In early March 2013, she traveled through Washington and Oregon delivering credit applications, explaining the time line for the distribution change, and encouraging the dealers to continue to purchase from Wanke until April 1, 2013.  (McNabb Dep. 101:12-19.)  Forbo provided its standard dealer price list for March 2013 to at least one dealer during this period.  (Asai Decl. Ex. 22, at 17.)  Forbo also created a common question and answer memo and asked its sales force across the nation to call on dealers, architects, and designers to provide information on the distribution change.  (Asai Conf. Decl. Ex. 22-A, at 45; McNabb Dep. 112:2-20.)

Through mid-March, the parties engaged in discussions to identify scenarios in which Forbo could continue to work with Wanke but were unable to reach a consensus.  (McClory June Decl. Ex. 45; Reimer Dep. 191:2-193:22.)  Eventually, Forbo formally proposed a dual distribution option in which Wanke retained the residential accounts in the front range territory of Washington and Oregon while Forbo took over the commercial and cross-over accounts and the rest of the territory. (McClory June Decl. Ex. 46.)  Wanke considered a counter-offer or a request for commissions on sales going forward, but did not think either would be received well.  (McClory June Decl. Ex. 47.)

In a report on North American business development dated March 20, 2013, Darragh reported with regard to Wanke that:

> We will make the transition and begin a new business structure in the Pacific Northwest April 1st. The following is an assessment of what has transpired in the Wanke Cascade territory YTD.
>
> Wanke Sales of Forbo:                -28.4% YTD February (no March results)
> Estimated Wanke inventory reduction:    approximately $250K
>
> The sales development YTD, while negative, is still within the ability to recover to be within the plan. There is no way to tell, but quite often in these situations, customers hold orders to deal in the new direct sales structure if possible. We clearly saw this with Phoenix, which lead to the first month record sales. We will have to wait and see. But what is clear is that they are further reducing inventory so the anticipated $1.1 million return should be down below $900K.

(Asai Decl. Ex. 7, at 52.)

On March 27, 2013, Forbo provided Wanke a termination agreement containing Forbo's final settlement offer. (McClory June Decl. Ex. 48.) The proposed termination agreement required Wanke to accept the terms of the Memo, provide Forbo with a list of Forbo flag-ship dealers and dealers with Forbo display racks, and release all claims against Forbo. (McClory June Decl. Ex. 48.) In return, Forbo would accept orders from Wanke to be delivered by June 30, 2013, the return of Wanke's Forbo inventory in sellable condition for credit, and responsibility for customer claims, and would pay Wanke commissions on Forbo sales within the territory through September 2013. (McClory June Decl. Ex. 48.) Forbo told Wanke that its failure to sign and return the termination agreement to Forbo by March 31, 2013, would void the offer. (McClory June Decl. Ex. 48, at 1.) Wanke considered the termination agreement an insult and unfair, and refused to sign it. (Bruce Dep. 249:5-19, 332:6-11.)

Near the end of March 2013, Forbo contacted all flooring dealers in the Pacific Northwest

having Forbo displays by email to inform the dealers of the distribution change effective April 1, 2013, and provide contact information for Forbo. (Asai Decl. Ex. 16, at 24; McNabb Dep. 127:2-24; Johnson Dep. 228:1-14.) McNabb had obtained a list of Wanke's customers from Wanke[7] in July 2012[8] to allow her to track projects and more efficiently respond to phone calls from dealers and sales representatives in that territory. (McNabb Dep. 129:21-130:23; Asai Decl. Ex. 25.) The list contained contact names, addresses, telephone numbers, and credit lines. (Mark Buckwold Dep. December 9, 2014 ("Mark Dec. Dep.") 142:17-143:3.) McNabb subsequently shared the list with Johnson despite a note on the list indicating "Please remember these are from Wanke and should not be shared," thinking it was permissible to share it with her boss. (McNabb Dep. 131:21-132:3; Asai Decl. Ex. 25, at 2.) Johnson forwarded the list to Darragh and John Kondrchek[9] on February 14, 2013, to be used as a reference point for determining proper credit limits for Wanke's dealer in new Forbo accounts. (Darragh Dep. 428:21-429:2; Kondrchek Dep. 184:20-185:22; Thorn Dep. 231:21-232:1; Asai Con. Dec. Ex. 5-A, at 11.)

As a result of the termination of its distributor relationship with Forbo, Wanke was no longer a major player in the commercial market after April 2013. (Mark June Dep. 284:12-20.) Wanke continued to sell its inventory of Forbo flooring to customers who had previously purchased such flooring but lost dealers that had purchased only Forbo flooring from Wanke. (Richard Dep. 82:14-

---

[7]McNabb believes Mark or Eppley provided information on how to obtain the list. (McNabb Dep. 129:2-17.)

[8]There is evidence McNabb obtained a customer list from Wanke in 2011 through Mark or Eppley for the same purpose. (McNabb Dep. 129:21-130:23, 132:13-20; McClory July Decl. Ex. 86.)

[9]While not specifically identified in the filings, Kondrchek had a Forbo email and appears to have been employed by Forbo during this period. (McClory June Decl. Ex. 45, at 1.)

19; Goodall Dep. 275:18-276:2.)  Wanke handled a collection of commercially warranted resilient sheet goods thereafter, with Itec becoming Wanke's lead product for the commercial market.  (Mark June Dep. 284:23-285:9.)  Wanke sales of Stonewood Flooring increased substantially in 2013, becoming a primary component of Wanke's sales volume.  (Heagy June Dep. 26:10-24.)  However, Wanke's sales representatives thought they would have been able to grow the Stonewood Flooring sales while continuing to sell Forbo flooring at the same levels.  (Morones Dep. 247:1-9.)  For the first time since 2007, Wanke showed a profit in 2013.  (Heagy June Dep. 70:7-21.)

III.  Forbo's Acceptance of Orders in the Pacific Northwest before April 1, 2013

A.  *American Home*

On April 1, 2013, Forbo received and created a purchase order dated March 26, 2013, from American Home and Stone, a Wanke dealer located in Oregon ("American"), which was billed, and therefore likely shipped, on April 2, 2013.  (McClory June Decl. Ex. 56, at 8; Heagy Oct. Dep. 95:24-96:1.)  Mark conceded Forbo's handling of the rush order from American was not improper if Forbo received the order on April 1, 2013, as Wanke was no longer able to take orders from customers for Forbo flooring after March 2013.  (Mark Dec. Dep. 49:14-23.)  However, Mark felt Forbo should have directed the sale to Wanke and intended to hurt Wanke by not doing so.  (Mark Dec. Dep. 54:15-55:8.)

B.  *Sustainable Floors*

Sustainable Floors, a commercial flooring contractor in Washington ("Sustainable"), had been a customer of Wanke since 2006.  (Mark Dec. Dep. 59:7-10.)  Forbo accepted orders from Sustainable for two projects to be installed in Hawaii around April 1, 2013.  (Mark Dec. Dep. 66:19-21, 86:25-87:3; McClory June Decl. Ex. 56, at 8.)  While Hawaii was not in Wanke's exclusive

territory, Wanke could sell product to its dealers for delivery within the Pacific Northwest even when the flooring was ultimately installed outside that territory. (Mark Dec. Dep. 57:9-14; 58:15-59:6.) Mark was confident Sustainable was on the list of dealers Forbo contacted in March 2013 and believed such contact resulted in Sustainable's order of flooring directly from Forbo. (Mark Dec. Dep. 81:4-82:8.) Sustainable continued to purchase flooring from Wanke after April 2013, but in a lesser amount. (Mark Dec. Dep. 60:12-15.)

### 1. Schofield Barracks

In May of 2012, Sustainable asked Wanke for pricing information on materials to be installed in the Schofield Barracks in Hawaii. (Mark Dec. Dep. 68:3-17.) In December of 2012, Wanke again communicated with Sustainable about the Schofield barracks project. (McClory June Decl. Ex. 59; Mark Dec. Dep. 79:17-20.) At that time, Sustainable advised Wanke that Tarkett's pricing on Johnsonite was twenty percent less than the price Wanke quoted for Forbo flooring and it intended to go forward with the Johnsonite product. (McClory June Decl. Ex. 59; Mark Dec. Dep. 78:15-79:10.) Sustainable ordered Johnsonite flooring but when issues with the delivery of the Johnsonite product developed, Sustainable purchased Forbo flooring directly from Forbo at a substantially discounted price. (Mark Dec. Dep. 80:18-21, 84:11-85:19.) The purchase orders for the Forbo flooring were dated March 27, 2013, created by Forbo on March 27, 2013, and received by Forbo on April 1, 2013. (Mark Dec. Dep. 82:7-12; McClory June Decl. Ex. 56, at 8.)

### 2. Leeward Community College

Sustainable also purchased flooring direct from Forbo for installation at Leeward Community College in Hawaii. (Mark Dec. Dep. 86:25-87:3, 87:11-13; McClory June Decl. Ex. 56, at 8.) The purchase order, dated March 27, 2013, was written by the customer and received by Forbo before

March 31, 2013.  (Mark Dec. Dep. 88:6-13; McClory June Decl. Ex. 56, at 8.)  Wanke had no involvement in the Leeward Community College project and does not know how Forbo got the order.  (Mark Dec. Dep. 87:11-88:16.)

IV.  Wanke's Other Manufacturers

   A.  Wanke's Distributor Agreements with Other Manufacturers

   None of Wanke's signed distributor agreements required more than ninety days' written notice prior to termination.  (Mark June Dep. 16:17-21.)  Most of Wanke's distributor agreements provided to the court, dating back to 1999, contained provisions requiring sixty days' written notice of a desire to not renew or to terminate the agreement without cause.  (McClory June Decl. Exs. 20, 21, 22, 23, 25.)  Some required ninety days' written notice, one required forty-five days' notice, and one required the parties to agree no later than sixty days before the expiration of the one-year term to keep the agreement in force.  (McClory June Decl. Exs. 24, 27,  29, 30, 31.)

   An unsigned  distributor agreement between IVC and Wanke provided for one hundred and twenty days' notice of termination.  (Reimer Dep. 103:24-25, 104 13-15, 105:21-13.)  A distributor agreement between IVC and Wanke prepared in 2013 required ninety days' written notice to terminate the agreement without cause.[10]  (McClory June Decl. Ex. 32.)  In January 2014, Wanke negotiated an increase in required notice from sixty to ninety days in a new distributor agreement with Tarkett.  (McClory June Decl. Exs. 33, 35; Mark June Dep. 279:18-21, 282:5-283:8; Reimer Dep. 112:24-113:2; Heagy June Dep. 59:3-60:3.)

   B.  Termination of Wanke's Distributor Agreements with Other Manufacturers

   On August 14, 2008, Unilin Flooring NC, LLC, advised Buckwold of its intent to terminate

---

[10]The agreement provided to the court was not signed.

its relationship with Wanke effective October 15, 2008, thereby providing the sixty days' written notice of termination required under the terms of the distributor agreement between Unilin and Buckwold dated July 17, 2000. (McClory June Decl. Ex. 28.) Also in 2008, Columbia Hardwood gave Wanke sixty days' notice of the termination of their distributor agreement. (Reimer Dep. 72:16-73:3.) On September 9, 2009, Tarkett notified Wanke of the termination of the Domco-labeled product line effective December 1, 2009. (Reimer Dep. 96:13-25.) The parties had engaged in many discussions planning for the discontinuation of the brand and Tarkett selected a date both parties considered fair and reasonable. (Bruce Dep. 243:20-244:11.)

In January 2012, Appalachian Engineered Flooring terminated its distributor relationship with Wanke with ninety days' notice pursuant to the terms of their agreement. (Reimer Dep. 100:8-13, 101:8-18.) The same month, Wanke advised its dealers in a memo addressed to "Valued Anderson Floor Dealer," of the termination of its distributor relationship with Anderson effective January 13, 2012. (McClory June Decl. Ex. 36; Mark June Dep. 183:7-20.) Shaw purchased Anderson, decided to continue to sell Anderson products under the Shaw name, and asked Wanke to invest in a new set of displays to support the new line. (Bruce Dep. 349:8-350:1.) Wanke indicated a willingness to continue as a distributor of the new Shaw products but only if Shaw was willing to cover the costs of the new displays. (Bruce Dep. 350:9-24.) When Shaw elected not to continue Wanke's distributor relationship with regard to the Anderson products, the relationship ended January 13, 2012, subject to some arrangements with regard to inventory. (Mark June Dep. 184:7-5, 186:3-17; Bruce Dep. 350:9-22.) Wanke emailed Anderson and requested the ninety-day termination notice in accordance with the distributor contract but did not pursue legal action for breach of contract when Anderson failed to comply. (Mark June Dep. 187:18-188:5.)

In a letter dated August 5, 2013, Tarkett confirmed its decision first discussed at a May 28, 2013 meeting to terminate Wanke as a distributor for the Azrock line and informed Wanke the termination would be effective November 30, 2013, provided Wanke agreed to transition to the Expression line. (McClory June Decl. Ex. 34; Reimer Dep. 115:5-13.) In the event Wanke elected not to distribute the Expression line, the termination would be effective October 31, 2013. (McClory June Decl. Ex. 34.) The distributor agreement covering the Azrock line required sixty days' notice before termination. (Reimer Dep 97:20-98:18.)

Generally, Berry Floor and Wanke engaged in discussions for nearly a year before Berry Floors pulled out of the flooring market. (Reimer Dep. 71:1-18.) While Formica and Wanke had a written distributor agreement requiring sixty days' notice of termination, the parties negotiated a longer transition period of up to twelve months due to the long-term strong relationship between the parties. (Mark Dep. 207:3-22.)

V.  Forbo's Other Distributors

*A.  Forbo's Distributor Agreements with Other Distributors*

Forbo's distributor agreements predominantly include a sixty-day termination notice requirement, with some full-line and residential distributors, such as Wanke, allowed a ninety-day termination notice. (Johnson Dep. 28:23-29:25; 239:8-240:2.) The Forbo distributor agreements provided to the court, which date back to 1992, provide for sixty days' written notice of termination. (McClory June Decl. Exs. 66-69.) At least one of the distributor agreements, signed in 1992, contained the same terms as the Memo. (McClory June Decl. Ex. 67.)

*B.  Termination of Forbo's Distributor Agreements with Other Distributors*

Forbo tries to advise distributors of its intent to terminate distributor agreements in person

before formal notice is provided. (Darragh Dep. 107:15-20.) Typically, when Forbo decides it wants to terminate a distributor agreement, it communicates that to the distributor and arranges a meeting to generally discuss the terms of the separation before it provides formal notice. (Johnson Dep. 57:18-5; Darragh Dep. 65:4-14.) Thereafter, the parties meet to negotiate the specifics of the termination, such as handling of the inventory, payment of receivables, commissions, purchase of display racks, and assumption responsibility for consumer claims. (Johnson Dep. 58:6-59:2, 70:21-71:10; Kondrchek 106:17-107:7.) Forbo generally provides sixty days' notice, accepts the return of certain inventory, and pays a diminishing spec fee for registered projects over a period of one hundred and eighty days. (Darragh Dep. 106:15-107:14.) Forbo's termination of AFS in 2003 followed this general practice. (Darragh Dep. 107:15-17, 108:2-6.)

In May 2003, CDC advised Forbo of its decision to increase its involvement with Tarkett and terminate Forbo. (Darragh Dep. 91:14-92:20.) The parties negotiated separation terms and a termination date and the parties issued a joint announcement "to show mutual respect to the organizations." (Darragh Dep. 93:16-94:8.) The termination was effective August 31, 2003. (Asai Decl. Ex. 6 at 23.)

In a letter dated December 29, 2004, Forbo confirmed its decision to terminate Professional Flooring Supply ("PFS") effective February 1, 2005. (Asai Decl. Ex. 6, at 25; Darragh Dep. 112:23-24.) Forbo notified PFS of the termination in a letter dated December 1, 2004, and the separation was not amicable. (Asai Decl. Ex. 6, at 26; Darragh Dep. 112:23-24, 114:15-21.) PFS did not register projects, making it difficult to agree on payments after termination, so Forbo paid PFS a flat commission of $100,000 to aid in the transition of the territory. (Darragh Dep. 114:1-21.) The parties did agree to terms with regard to inventory and displays and to allowing Forbo to mail

information to dealers in mid-January.  (Asai Decl. Ex. 6, at 25-26.)

VI.  Commercially Reasonable Termination Notice

    *A. Wanke*

       1.  Expert Testimony

Wanke retained James C. Gould ("Gould") as its expert on the issues of "whether [Forbo] provided reasonable notice to Wanke prior to its termination in 2013 and whether Forbo's termination of Wanke was consistent with industry practice."  (Asai Decl. Ex. 23, at 2.)  Gould has been in the flooring industry for nearly fifty years, starting as a commercial specialist in his family's flooring distributorship, Misco Shawnee Inc. ("Misco").  (Asai Decl. Ex. 23, at 2.)  Gould was promoted through the ranks and eventually became President of Misco in 1979.  (Asai Decl. Ex. 23, at 2.)  In 2003, Gould sold Misco and became Chief Officer of CCA Global Partners, overseeing annual purchases of more than three billion dollars of floor covering by 2,400 member retailers and managing relationships between manufacturers and distributors.  (Asai Decl. Ex. 23, at 4-5.) Gould left CCA Global in 2007 and founded the Floor Covering Institute LLC, an independent consultancy focused on the floor covering industry and related markets in North America, Europe, Asia, South Africa, and New Zealand, and addressing all aspects of the flooring industry, including distribution. (Asai Decl. Ex. 23, at 2-3, 5.)

Prior to 1980, Misco carried only Mohawk Carpet ("Mohawk") flooring and was Mohawk's largest distributor.   (Asai Decl. Ex. 23, at 3.)  In 1980, after Misco and Mohawk agreed Misco should diversify into non-carpet product lines, Misco added other flooring lines, including Armstrong.  (Asai Decl. Ex. 23, at 3.)  However, Mohawk continued to represent a significant percentage of Misco's volume and net profit.  (Asai Decl. Ex. 23, at 4.)

In 1985, Mohawk decided to eliminate its distributors and start selling directly to retailers. (Asai Decl. Ex. 23, at 4.) Mohawk provided ninety days' notice to its distributors but then scheduled meetings to determine the best transition strategy for its distributors. (Asai Decl. Ex. 23, at 4.) In the end, Misco was allowed a one-year transition period which facilitated a smooth transition of sales, profits, customer data, existing projects, claims, repurposing of facilities, locating new suppliers, and retraining personnel. (Asai Decl. Ex. 23, at 4.) "The objective was to keep each company as whole as possible and to keep sales and reputations intact; damage to the two companies was held to an absolute minimum." (Asai Decl. Ex. 23, at 4.)

Gould notes that "[b]ecause every relationship is unique between a supplier and wholesale distributor, the industry does not have a 'Standard Contract' or 'Standard Termination Policy." (Asai Decl. Ex. 23, at 10.) As such, no "industry standard" for the amount of reasonable notice of termination exists in the flooring industry. (Gould Dep. 257:14-258:1.) However, a terminated party should never be surprised by a termination, either with or without cause. (Asai Decl. Ex. 23, at 13.) For example, when Armstrong moved from single to dual distribution, Armstrong discussed the transition with Misco for nearly three years. (Asai Decl. Ex. 23, at 13.)

In the absence of a written agreement, both parties have a general obligation to act with "good will and fairness," including the obligation to give the other party reasonable notice if a party wants to terminate the relationship. (Asai Decl. Ex. 23, at 12-13.) The reasonableness of such notice is based on a variety of factors, including: the length of the relationship; the importance of the relationship; the amount of investment; and the time required to transition away from the relationship. (Asai Decl. Ex. 23, at 13.) "Simply stated, in any termination the parties should try to minimize the damage to each other, and to be fair to each other." (Asai Decl. Ex. 23, at 14.)

"Losing a major supplier or a manufacturer would take a distributor additional time to transition." (Asai Decl. Ex. 23, at 13.) The more significant the manufacturer is and the more unique the product line is, the longer it will take to transition from the loss of that manufacturer, including finding a replacement manufacturer, if available. (Asai Decl. Ex. 23, at 14.)

A manufacturer becomes a major supplier for a distributor when sales of that manufacturer's product by the distributor are significantly larger than the product of any other manufacturer, such as twenty percent of the volume of that distributor, and the distributor becomes identified in the marketplace as being the distributor for that manufacturer. (Gould Dep. 140:23-141:8.) Finding a replacement for Forbo, the major supplier of a linoleum – a unique product – would be extremely difficult because the industry only has two other significant suppliers of linoleum. (Asai Decl. Ex. 23, at 13-14.) Forbo holds between seventy to eighty percent market share for linoleum, while Armstrong has a fifteen percent share and Tarkett has only a few percentage points. (Gould Dep. 53:3-9.)

Gould did not consider the sixty-day notice Forbo gave to Wanke reasonable in light of their long-term relationship and he expressed the opinion that the manner in which Forbo terminated Wanke was unprofessional and contrary to good industry practice. (Asai Decl. Ex. 23, at 14-15.) He believed Forbo should have told Wanke it was considering terminating the relationship, engaged in discussions on how to successfully transition away from the relationship, and negotiated a joint press release, a process that should have taken months, if not years, to reasonably accomplish. (Asai Decl. Ex. 23, at 15.) Gould based his opinion on, among other things, the length and exclusivity of the relationship; the amount of flooring Wanke purchased from Forbo, both on its own and in comparison to Wanke's other manufacturers; Wanke's investment in inventory, receivables,

personnel, warehouse space, administrative systems, and management unique to Forbo; Wanke's reliance on Forbo's assurance Wanke would be Forbo's exclusive distributor both at the time Buckwold purchased Wanke and thereafter, as well as continuing assurances Wanke would continue to be Forbo's distributor; Forbo's planning for, or consideration of, Wanke's termination as early as February 2012; and Forbo's actions when terminating other distributors, particularly Phoenix. (Asai Decl. Ex. 23, at 15-18.) Gould did not opine on the amount of notice Forbo should have given Wanke under industry standards. (Gould Dep. 258:2-11.)

       2.  Lay Witness Testimony

Bruce, who has been in the flooring industry since 1972, indicated in his experience, parties to a distributor agreement generally discuss issues in the relationship or negotiate a transition process before issuing a formal notice of termination. (Bruce Dep. 127:16-128:10, 138:10-13, 228:10-229:8.) He believes the amount of notice required should be based on the specifics of the relationship between the manufacturer and distributor, and what is fair and reasonable to both parties in light of their current position in the marketplace. (Bruce Dep. 301:18-302:18.) Bruce is comfortable with sixty days' notice of termination for distributor relationships involving insignificant or small lines. (Bruce Dep. 243:6-11.) He does not believe ninety days' notice of termination is fair in a distributor relationship involving a major manufacturer that has a significant share market with a broad-based product line in light of the significant investment required of a distributor to enter into such a relationship. (Bruce Dep. 235:9-236:10.) Based on his discussion with other Armstrong distributors, Bruce believes all would agree a minimum one-year notice period is fair and reasonable when the distributor has made a major investment in an exclusive flooring line. (Bruce Dep. 364:3-17.) Bruce would expect IVC to provide Wanke a minimum of twelve-months

notice of termination under their oral agreement.  (Bruce Dep. 236:11-18.)

Heagy testified a reasonable notice of termination depends on the parties' relationship over time, the importance of the product line to the distributor, and the investment by the distributor in the product line.  (Heagy June Dep. 99:10-101:10.)  He believes some relationships, such as Buckwold's relationship with Armstrong, justify well over a twelve-month termination notice. (Heagy June Dep. 105:25-106:1-9.)  He stated when the product line is smaller, sixty to ninety days is not unreasonable.  (Heagy June Dep. 61:23-62:13, 91:8-15.)

Reimer represented Wanke's agreements typically cover a range from forty-five to one hundred twenty days' notice of termination based on the size, sales, and inventory of the product line at issue.   (Reimer Dep. 24:13-20, 25:8-19, 26:1-6.)  He considered sixty-to-ninety days' notice reasonable for a product line with $500,000 to $600,000 in inventory and $1,500,000 in annual sales. (Reimer Dep. 26:15-19, 28:1-5.)  A product line with $1,000,000 in inventory would require a minimum of one hundred twenty days' notice, with six months being preferable.  (Reimer Dep. 28:22-29:2.)  Wanke carried a least one and a half to two million dollars of Forbo inventory. (Reimer Dep. 46:14-18.)  Reimer  is not aware of any distribution agreements, including Wanke's, which condition the amount of notice on size of inventory or annual sales.  (Reimer Dep. 29:12-30:13.)  Reimer considers the sixty-day notice requirement in the Domco and Formica agreements unreasonable based on the size of the product lines and generated sales.  (Reimer Dep. 80:4-18, 82:3-6-83:9.)

Eppley considered the sixty-day notice of termination provided by Forbo to Wanke reasonable only if the Memo governed the relationship. (Eppley Dep. 140:6-21.)  In light of the absence of a contract, he thought ninety days' notice, at a minimum, would generally be reasonable

based on industry notice standards and his nearly forty years in the flooring industry. (Eppley Dep. 69:11-70:3, 146:23:147:20.)

B. *Forbo*

1. Expert Testimony

Forbo retained Phillip Vultaggio ("Vultaggio") as its expert to consider the evidence in this matter and offer his "expert opinions concerning Forbo and Wanke's actions and flooring industry standards regarding the matters in dispute." (McClory June Decl. Ex. 71, at 1.) Vultaggio has been in the flooring industry since 1975, when he started Parkwood New England ("Parkwood"), a distributor of high-end interior finishes, with an emphasis in resilient floor coverings. (McClory June Decl. Ex. 71, at 23.) He sold Parkwood in 1996, but remained its President for five more years. (McClory June Decl. Ex. 71, at 23.) He worked at two long-term consulting jobs over the next three years, and created a union shop, floor covering installation company for a furniture distributor. (McClory June Decl. Ex. 71, at 23.) He currently consults selectively with floor covering businesses. (McClory June Decl. Ex. 71, at 23.)

Vultaggio opined the "floor covering industry standard for the termination of a distributor-manufacturer agreement is 30 to 90 days with or without cause." (McClory June Decl. Ex. 71, at 1.) However he testified at his deposition the amount of notice required for termination depends on the specific circumstances, such as if the termination is with cause or without cause. (Vultaggio Dep. 72:22-25.) He stated that while egregious violations of a contract support immediate termination, he considers thirty days' notice sufficient for without-cause terminations, but concedes the industry standard is thirty to ninety days. (Vultaggio Dep. 72:22-73:8.) During his involvement with Parkwood, Vultaggio was unable to get any manufacturer to agree to a termination notice period

Page 34 - FINDINGS AND RECOMMENDATION                    *{SIB}*

exceeding ninety days despite his requesting such an extension in virtually every negotiation. (Vultaggio Dep. 75:19-76:9.)

Vultaggio considered Forbo's termination of Wanke to be commercially reasonable. (McClory June Decl. Ex. 71, at 1.)  His opinion was based on Wanke's knowledge of its poor sales numbers and Forbo's resulting concern; Forbo's advising Wanke of the "high probability" of termination on January 8, 2013; Wanke's failure to devise a plan to increase Forbo's sales or salvage the distribution relationship, both before and after notice of termination; Forbo's attempts to negotiate a termination agreement; Wanke's shift of focus from Forbo to other flooring lines starting in 2010; and the similarity of the termination letter to others sent by Forbo and received by Wanke. (McClory June Decl. Ex. 71, at 5, 19.)  Specifically with regard to the commercial reasonableness of the sixty-day termination notice, Vultaggio explained concerns of Wanke spreading false and damaging information about Forbo, an increased collection risk, confusion in the marketplace, Wanke establishing a relationship with another linoleum manufacturer and immediately dropping Forbo, removal or destruction of Forbo samples and display racks, and a decreased incentive to train Forbo sales people, or maintain or sell Forbo flooring, all justified Forbo in not providing more notice of termination.  (McClory June Decl. Ex. 71, at 5-7.)

### 2.  Lay Witness Testimony

Darragh has never been involved as manager of Forbo with the termination of a full-line exclusive distributor in the absence of a written agreement.  (Darragh Dep. 39:14-17.)  In his opinion, the majority of terminations of a distributor by a manufacturer are accomplished with sixty days' or less notice, and when distributors terminate manufacturers, there is generally no notice at all.  (Darragh Dep. 382:19-383:6.)  Darragh considers the general industry standard for termination

notice to be in the sixty-day range. (Darragh Dep. 151:5-8.) Johnson also considers sixty days' notice of termination to be generally acceptable within the industry but recognized exceptions exist. (Johnson Dep. 240:3-14.)

Before retiring in 2009, Gene Berg ("Berg") had more than thirty years' experience in the flooring industry as a warehouse worker, owner of a retail flooring business, and regional manager for Forbo and Azrock Industries. (Berg Dep. 4:15-5:12, 6:9-15, 7:14-18.) Berg explained the notice given and the handling of inventory is different when a distributor drops a manufacturer compared to when a manufacturer drops a distributor.    For example, when a distributor terminates a manufacturer, the distributor generally retains the inventory but if the manufacturer terminates the distributor, the manufacturer usually buys back the inventory. (Berg Dep. 58:16-59:4.) It is unclear from his testimony whether manufacturers or distributors generally provided a longer notice of termination. (Berg Decl. 62:18-63:1.)

### C. Independent Lay Witness Testimony

Kevin Born, Vice President of Commercial Sales for Armstrong ("Born") explained that when Armstrong terminates a distributor, it is never a surprise because Armstrong initiates discussions with the distributor about their failure to meet performance standards prior to issuing notice of termination, and notice of ninety days or more is typical. (Born Dep. 22:19-23:1, 27:10-17, 75:16-76:3.) Armstrong works closely with its distributors to negotiate a smooth and amicable date for the termination, the handling of inventory and outstanding claims, and prorated compensation. (Born Dep. 73:17-74:15.) Armstrong is concerned about protecting the dealers' customers and tries to minimize any downstream impact on their future and existing customer base. (Born Dep. 73:17-74:15.) Born has never been involved in a termination without cause. (Born Dep. 81:12-23.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2013). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV.

P. 56(c) (2013).  The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I.  First Claim for Relief – Breach of Contract

Forbo moves for summary judgment on Wanke's breach of contract claim arguing the undisputed evidence establishes Forbo's was notice was commercially reasonable.  The parties agree the oral agreement entered into between Bruce and Darragh in 2006 governs their previous relationship.  While Bruce described the agreement as "long-term," the parties did not set a specific term for the agreement or discuss the method for terminating the agreement.

Under Oregon law, an agreement which has no defined term, such as the oral agreement between Wanke and Forbo, may be terminated at will upon receipt of reasonable notice of a party's intent to terminate.  *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 442 (2010).  Similarly, the Uniform Commercial Code ("UCC")[11] specifically provides that contracts for an indefinite term are terminable at will by either party and  termination of such a contract "requires that reasonable notification be received by the other party. . . ."  OR. REV. STAT. 72.3090 (2015).  The issue then becomes what constitutes "reasonable notice".

"Whether a time for taking an action required by the Uniform Commercial Code is reasonable depends on the nature, purpose and circumstances of the action." OR. REV. STAT.

---

[11]The parties agree the UCC governs the oral agreement.

71.2050 (2015). Relying on an official comment to the UCC, the Ninth Circuit held the reasonableness of notice required under Section 72.3090 "is judged by the amount of time necessary to enable the distributor to look for a new source of supply." *Zidell Explorations, Inc. v. Conval Int'l, Ltd.*, 719 F.2d 1465, 1473 (9th Cir. 1983)(citing OR. REV. STAT. 72.3090(3); U.C.C. § 2-309 official comment 8.) However, comment 8, on which the Ninth Circuit relied, noted only that the "application of principles of good faith and sound commercial practice *normally* call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement," and did not limit consideration to this one factor. OR. REV. STAT. 72.3090 official comment 8 (emphasis added).

Other courts have expanded the factors to be considered in determining whether notice given was reasonable under the UCC.[12]  The Kentucky Court of Appeals noted, "[t]he obvious object of the reasonable notice requirement is to afford the party losing the contract an opportunity to make appropriate arrangement[s] in lieu thereof by dispersing inventory, adjusting work force, exploring probable alternatives, and in general 'getting his house in order' to proceed in the absence of the former relationship.  It is based on fairness and equity." *Pharo Distrib. Co. v. Stahl*, 782 S.W.2d 635, 638 (Ky. App. Ct. 1989).  When considering whether an action is commercially reasonable, courts should look to "prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or similar business" as evidenced by "customs and usages that actually govern the members of a business calling day-in and day-out." *Nat'l Hous. P'ship v. Mun. Capital Appreciation Partners I, L.P.*, 935 A.2d 300, 316 (D.C. App. Ct.

---

[12]The UCC was intended to create uniformity between the states with regard to the regulation of commercial dealing.  Accordingly, it is appropriate to rely on cases from other states to ensure such uniformity. *See Jo-Ann, Inc. v. Alfin Fragrances, Inc.*, 731 F. Supp. 149, 153-54 (D.N.J. 1989)

2007)(citation omitted). Reasonableness of notice is generally a factual issue to be decided by a jury. *Zidell*, 719 F.2d at 1474.

Forbo asserts the record establishes the sixty-day notice provided was reasonable and provides no support for Wanke's claim they were entitled to a minimum notice period of one year. Alternatively, Forbo contends the evidence may support a finding ninety days' notice was required and asks the court to limit Wanke's damages to losses incurred prior to May 1, 2013. Wanke argues it has presented sufficient evidence to create a genuine issue of material fact on the question of reasonable notice, thereby defeating Forbo's motion for summary judgment. The court agrees with Wanke.

First, the parties presented evidence of notice requirements in written distributor agreements by providing copies of agreements to which they were a party. A review of these agreements reveals notice periods of forty-five to ninety days. While sixty days' notice falls within these parameters, the evidence equally supports a finding that ninety days' notice is reasonable as well.

Next, the parties offered evidence of the amount of notice provided to them in the termination of other written distributor agreements. Anderson and Wanke ended their distributor agreement on short notice when Shaw purchased Anderson and required Wanke to invest in new displays to retain the Anderson flooring line.[13] Wanke received sixty days' notice of termination from Unilin and Columbia, and ninety days' notice from Appalachian Engineered Flooring, all in accordance with the notice provisions in the written distributor agreements. Tarkett gave Wanke nearly ninety days' notice of the termination of the Domco product line and a total of either three-to-four months' formal

---

[13]Wanke asked Anderson to honor the ninety-day notice requirement in their written agreement but did not press the issue when Anderson refused.

notice of the termination of the Azrock line, as well as advising Wanke of its decision to terminate two months before formal notice, even though written agreement for the Azrock line required only sixty days' notice.  Berry Floor gave Wanke nearly a years' notice of its intent to pull out of the flooring market, resulting in the termination of their distributor agreement and, despite a written agreement requiring sixty days' notice, Formica afforded Wanke a transition period of nearly a year due to their strong, long-term relationship.  Based on this evidence, Wanke has received notice of termination ranging from two weeks (which it disputed as unreasonable) to one year.

Forbo generally advises a distributor of its intent to terminate it and negotiates transition logistics before it provides formal notice, which is usually sixty days.  Forbo provided PFS with formal notice thirty-three days before the scheduled termination, but advised PFS of its intent to terminate twenty-eight days before that, in a less than amicable separation.  However, Forbo worked with PFS in a transition strategy.  CDC advised Forbo of its decision to terminate their relationship in May 2003 and the parties negotiated separation terms, a joint press release, and a termination date, which was August 31, 2003, providing at least ninety days' notice.  In these instances, the notice periods ranged from sixty-to-ninety days.

The most relevant termination by Forbo is that of Phoenix, which occurred the year before Wanke's.  The written distributor agreement provided for one hundred and eighty days' written notice.  However, Forbo provided nearly twice that amount, notifying Phoenix by letter dated March 30, 2012, of the termination of the relationship effective March 16, 2013.  The extended notice period was offered in "good faith" to allow Phoenix "to develop a plan for realigning [] operations in light of the pending termination."  While Phoenix exclusively distributed Forbo flooring and had more to lose than Wanke, which distributed other flooring products, there is evidence Wanke had

become synonymous with Forbo and Forbo was Wanke's core line, representing more than twenty-five percent of Wanke's sales.  Additionally, the length of the relationship between Wanke and Forbo exceeded that of Forbo and Phoenix.  Accordingly, Forbo's provision of nearly one years' notice of termination to Phoenix, a distributor arguably equivalent to Forbo, is evidence supporting Wanke's claim one years' notice was commercially reasonable under the circumstances.

Forbo's appears to argue Wanke's failure to object to the sixty days' notice of termination by Forbo in 2000 is evidence that sixty days' notice is reasonable.  This argument is not well taken.  First, Forbo terminated only a portion of Wanke's territory, not all of it.  Additionally, the parties had been discussing the termination for eighteen months prior to the issuance of the sixty-day notice.  Finally, the termination occurred six years before Buckwold purchased Wanke and the new oral distributor agreement began.

Finally, the parties offered expert and lay-witness testimony on the issue of commercially reasonable notice.  As expected, the experts differ on the reasonableness of the notice.  Gould, who opined the sixty days' notice was not reasonable, explained the reasonableness of notice is based on a variety of factors, with the ultimate goal to keep the damage to the two companies to an absolute minimum.  He described a termination in which the manufacturer provided ninety days' notice of its intent to sell directly to retailers but then provided the distributor a one-year transition period to facilitate a smooth transition for both companies and their customers. While not providing a specific number, Gould indicated in light of the relationship between Wanke and Forbo, Wanke's investment in Forbo flooring, and Forbo's assurances, among other factors, the termination should have taken months, if not years, to reasonably accomplish.  On the other hand, Vultaggio opined sixty days' notice was reasonable based, in part, on Wanke's decreasing sales of Forbo and increased emphasis

on other flooring products, the January 8, 2013 statement of a high probability of termination, and Forbo's concerns of retaliatory conduct by Wanke.

The lay-witness testimony is similarly disparate with Wanke's witnesses representing a distributor in a long-term relationship with a large investment in a core supplier deserves a minimum of one years' notice and Forbo's witnesses testifying sixty days' notice is the general industry standard. The one arguably independent witness[14] considered ninety days or more to be typical, and stated it is never a surprise when Armstrong terminates a distributor because they always initiate discussions prior to termination and work closely with their distributors to negotiate a smooth transition to minimize impact on the customer base.

Case law also supports Wanke's assertion it was entitled to at least one years' notice of termination. In a case virtually identical to the one at issue, the New Jersey Supreme Court held a distributor was entitled to twenty months' notice of termination. *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 130 (1976). In *Bak-A-Lum*, the parties entered into an oral agreement in which Bak-A-Lum would be the exclusive distributor for Alcoa's aluminum siding in Northern New Jersey. *Id.* at 126. The agreement did not preclude Bak-A-Lum from distributing other lines of siding but did require it exert its best efforts to promote the sales of Alcoa siding, which it did. *Id.* at 126-27. Six or seven years later, in January or February of 1969, Alcoa made the decision to enlarge the number of distributors in Northern New Jersey but did not advise Bak-A-Lum of its decision. *Id.* at 128. In the Spring of 1969, Bak-A-Lum engaged in a major expansion of its warehouse facilities and entered into a five-year lease for the new space resulting in significantly

---

[14]Buckwold is a major Armstrong distributor and, as a result, Born may be viewed as siding more with Wanke in this instance.

increased operating expenses. *Id*. at 127. Alcoa appointed four additional distributors to share Bak-A-Lum's territory in January 1970, effectively terminating Bak-A-Lum's exclusive distributorship without any notice. *Id*. at 127.

The trial court determined Bak-A-Lum was entitled to seven months' notice, which as the amount of time it considered necessary to allow Bak-A-Lum to "make adjustments and to plan and arrange from business activities to replace those which are to be eliminated." *Id*. at 128. The New Jersey Supreme Court disagreed, expressing concern the lower court placed little weight on circumstances of the new lease, and found that "a reasonable period of notice of termination of the distributorship, under all the circumstances, would have been 20 months." *Id*. at 130.

Forbo contends *Bak-A-Lum* is not relevant in that it was not decided under the UCC. However, it is clear from the opinion the court considered the reasonableness of the notice under the factors identified in the UCC. Additionally, the siding industry and the flooring industry, both in the general construction business, arguably have similar trade practices. Accordingly, the court finds *Bak-A-Lum* instructive here.

Forbo encourages the court to give great weight to *Armstrong World Indus., Inc. v. Robert Levin Carpet Co.*, No. Civ.A. 98-CV-5884, 1999 WL 387329 (E.D. Pa. May 20, 1999). In *Armstrong*, Levin had been a distributor of Armstrong's products since 1943 pursuant to written agreements with three-year terms which were renewed every three years. *Id.* at *1. In July 1996, the parties entered into new agreements that would "continue for one year from the date of this Agreement." *Id.* at *1. The agreements also provided either party could terminate with no less than ninety days' written notice. *Id.* at *1. In June 1997, Armstrong attempted to terminate Levin's rights under the agreements without ninety days' notice. *Id.* at *2. Levin filed claims against Armstrong

for breach of contract, account stated, and unjust enrichment.  *Id.* at *2.

The court found the only logical interpretation of the express terms of the agreements was that the agreements were for one year only.  *Id.* at *3.  Accordingly, "because Armstrong ceased the parties' relationship after the distribution agreements had expired, it was not obligated to give Levin notice."  *Id.* at *3.  The court did not consider the notice given to be reasonable under the UCC, rather it found no notice was necessary at all.  *Armstrong* is not applicable to the situation at hand, where the parties had a ongoing oral agreement that could be terminated only with reasonable notice.

The record is replete with genuine issues of material fact on the issue of commercially reasonable notice.  The parties have presented evidence supporting their positions which contradicting the opposing position.  Admittedly, a court may determine whether notice given is commercially reasonable in unique circumstances, such as when virtually no notice is given at all. *Jo-Ann, Inc.*, 731 F. Supp. at 160 (reasonable trier of fact could only find termination effective upon notice was not reasonable);  *Pharo Distrib.*, 782 S.W.2d at 639 (six days' notice of termination of long-term distributor agreement unreasonable as a matter of law).  However, this is not such a unique circumstance, but rather a common case involving the reasonableness of notice in an situation with outstanding genuine issues of material fact.  Accordingly, Forbo's motion for summary judgment on Wanke's breach of contract claim should be denied.  Forbo's alternative motion to limit damages to losses incurred prior to May 1, 2013, should be denied as well.

## II.  Covenant of Good Faith and Fair Dealing

In its Second Claim for Relief, Wanke alleges Forbo breached the implied duty of good faith and fair dealing by "failing to act with honesty in fact and by failing to observe commercial standards of fair dealing" with regard to the termination of the parties distributor relationship.  (Second Am.

Compl. ¶45.)  Initially, Forbo moved for summary judgment arguing, correctly, that the termination

of an at-will contract, alone, does not violate the implied duty of good faith and fair dealing.  *See*

*U.S. Genes v. Vial*, 143 Or. App. 552, 557 (1996)("The implied covenant of good faith does not limit

a party's right to terminate an at-will contract.")  However, in its opposition briefing, Wanke made

it clear it is not claiming Forbo breached its duty of good faith and fair dealing by terminating the

relationship but, rather, by the circumstances surrounding the termination.

Specifically, Wanke claims Forbo's failure to give commercially reasonable notice before

terminating the distributor relationship was in bad faith.  Additionally, Wanke complains about

Forbo's assurances to Wanke of its intent to continue the relationship into 2013 while engaged in

discussions to terminate Wanke in early 2012.  Finally, Wanke notes Forbo used Wanke's

confidential customer list to set up Forbo customer accounts and Darragh sought information to

enable him to "bury" or "really hurt" Wanke during the sixty-day period after formal notice and

before termination.  In its reply brief, Forbo now argues Wanke has failed to present evidence Forbo

violated reasonable commercial standards in the flooring industry or, if such violations occurred, that

Wanke suffered any damages as a result.

The Oregon Supreme Court has held the statutory duty of good faith found in the UCC

displaces the common law duty of good faith in transactions to which the UCC applies.  *U.S. Nat'l*

*Bank of Oregon v. Boge*, 311 Or. 550, 563 (1991).  The general provisions of the UCC[15] specifically

provide that "[e]very contract or duty within the Uniform Commercial Code imposes an obligation

of good faith in its performance and enforcement" and define "good faith" as "honesty in fact and

---

[15]The general provisions of the UCC, found in OR. REV. STAT. 71.1010-.3100, apply to transactions governed by the remainder of the UCC, including chapter 72, codified as OR. REV. STAT. 72.1010-.8200.  OR. REV. STAT. 71.1020 (2011)

the observance of reasonable commercial standards of dealing." OR. REV. STAT. 71.3040, 71.2010(2)(t). These provisions encompass both a subjective standard (honesty in fact), as well as an objective standard (reasonable commercial standards of fair dealing).

The oral distributor agreement between the parties remained in effect until its termination on April 1, 2013. Prior to such termination, Forbo had a duty to act honestly and reasonably with regard to the agreement and its relationship with Wanke. Wanke offered evidence Forbo assured Wanke of its satisfaction with Wanke and intent to continue the relationship through 2013, both through direct communications and the preparation of budgets, despite internal discussions from as early as February 2012 that Forbo intended to terminate Wanke soon. This evidence raises a genuine issue of fact whether Forbo was honest with Wanke during this period. Additionally, Forbo obtained Wankes's customer lists for the purpose of providing efficient service to Wanke's customers but then used information from those lists to contact Wanke's customers prior to the termination of the relationship and establish proper credit limits while getting customers accounts set up for the transition. While Forbo may have obtained the list in good faith and for a proper purpose, the use of information from that list to create Forbo customer accounts could be viewed as an improper purpose and evidence of bad faith. Finally, a reasonable trier of fact could find Darragh's attempt to uncover information that could be used to commercially disadvantage Wanke's owners prior to the termination of the oral distributor agreement did not qualify as a reasonable commercial standard of fair dealing. Accordingly, a genuine issue of material fact exists with regard to Forbo's breach of the implied duty of good faith and fair dealing.

Forbo also argues Wanke has failed to establish any injury arising from Forbo's failure to act honestly. Forbo raised this issue for the first time in its reply brief and Wanke has not had the

opportunity to respond to this argument with either argument or evidence. The court "need not consider arguments made for the first time in a reply brief." *Mitchell v. Tri-County Metro. Transp. Dist.*, No. 04-CV-1359-BR, 2005 WL 3447941, at *9 (D. Or. Dec. 15, 2005). The court should not find Wanke has failed to establish the existence of any injury from Forbo's bad faith when Forbo has deprived them of the opportunity to do so. Forbo's motion for summary judgment on Wanke's claim for breach of the implied duty of good faith and fair dealing should be denied.

III. Third Claim for Relief – Intentional Interference with Economic Relations

Wanke's intentional interference with economic relations claim ("interference claim") is premised upon Forbo's issuance of the press release without Wanke's permission and contacts with Wanke's customers both during the formal sixty-day notice period and before a reasonable notice of termination period. Wanke alleges as a result of Forbo's conduct, Wanke suffered lost sales and profits, and damage to its reputation and goodwill in the business community. However, during discovery, Wanke represented its interference claim is based on Forbo's sales to American and Sustainable in late March and early April 2013. (Heagy Oct. Dep. 162:3-25; McClory June Decl. Ex. 56, at 8.) In his deposition, Mark conceded if Forbo accepted American's order after April 1, 2013, it was not improper. Wanke has presented no evidence Forbo received, or was even aware of, the American order prior to April 1, 2013. Accordingly, Wanke's interference claim relies solely on Forbo's sales to Sustainable.

To state an interference claim under Oregon law, a plaintiff must allege:

(1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6) damages.

*Nw. Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 497 (1999).  Forbo argues Wanke has failed to establish the fourth element – that Forbo acted through improper means or for an improper purpose – noting the facts establish only that Forbo may have received two purchase orders from Sustainable prior to April 1, 2013.

Admittedly, Wanke has not presented evidence of Forbo's contacts with Sustainable resulting in the sales.  However, Wanke has presented evidence of Forbo's expressed desire to hurt or bury either Wanke, the Buckwolds, or both.  This alone supports a finding of improper purpose.

Additionally, Wanke has presented evidence Forbo engaged in improper means.  "Improper means" for an interference claim include "violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation, and disparaging falsehoods," and may "be established by showing a violation 'of a statute or other regulation, or a recognized rule of law, or perhaps an established standard of a trade or profession.' "  *Conklin v. Karban Rock, Inc.*, 94 Or. App. 593, 601(1989); *Volt Services Group v. Adecco Emp't Services, Inc.*, 178 Or. App. 121, 129 (2001)(quoting *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 209-10 (1978)).

First, if not foremost, Forbo engaged in activity which ultimately violated Wanke's right to be the only distributor of Forbo flooring in the Pacific Northwest.  The actions taken by Forbo during Wanke's period of exclusivity could be viewed, by a reasonable factfinder, as improper.   The language of the press release indicating Forbo would be selling products to flooring dealers in the Pacific Northwest *by* April 1, 2013, rather than *on* April 1, 2013, is arguably a misrepresentation with regard to Forbo's exclusivity ending before April 1, 2013.  Forbo encouraged dealers to contact Forbo to create customer accounts, initiated contact with dealers in the Pacific Northwest, both in person and through emails, and provided Forbo's dealer price list before the April 1, 2013

termination date. This conduct reasonably supports a finding Forbo acted with the intent to interfere with Wanke's right be the exclusive distributor of Forbo in the Pacific Northwest. Furthermore, Bruce expressed concern, and Darragh admitted, that once dealers became aware Forbo intended to transition to direct distribution in the Pacific Northwest, they would hold their orders in the last month to enjoy the benefits of the direct sales structure. Accordingly, issuing the press release in mid-February over Wanke's objections could have encouraged Wanke's customers to withhold purchases until April 1, 2013, thereby depriving Wanke of the right of such sales as exclusive distributor prior to that date.

While Wanke has provided no direct evidence the Sustainable purchase orders resulted from improper interference with Wanke's relationships with its dealers prior to April 1, 2013, it would not be unreasonable for the trier of fact to reach such conclusion. Sustainable was a customer of Wanke, likely received the information in the press release, was on the list provided to Wanke which Forbo used to contact dealers in Wanke's territory, and the purchase orders were created on March 27, 2013, all supporting a finding of improper contacts before April 1, 2013. Additionally, viewing the evidence in a light favorable to Wanke, the nonmoving party, Forbo received the Sustainable purchase orders on March 27, 2013, while Wanke was still the exclusive distributor of Forbo flooring in Washington. Forbo's failure to forward the orders to Wanke or redirect the customers back to Wanke violated such exclusivity and was improper.

Forbo appears to argue that because Wanke's territory did not include Hawaii, it would not have been able to accept the orders from Sustainable. However, there is evidence in the record that Wanke could sell Forbo flooring to be installed outside the Pacific Northwest as long as delivery of the flooring was within their territory. As the flooring orders at issue were shipped to Sustainable

in Washington, Wanke could have supplied the flooring.

The court finds Wanke has presented evidence Forbo intentionally interfered with Wanke's customers prior to the termination of the exclusive distributor agreement through improper means and with an improper purpose, and that such interference resulted in the Sustainable sales. Forbo is not entitled to summary judgment on Wanke's interference claim.

### Conclusion

Forbo's motion (#109) for summary judgment should be DENIED.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **April 11, 2016**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 24th day of March, 2016.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge